November 10, 1860.

## SUPREME COURT—HABEAS CORPUS.

### IN THE MATTER OF CHARLES KAUFFMAN.

CONSTRUCTION of the 10th Article of the American Treaty in regard to the arrest and detention of deserting seamen.

A deserter once arrested and held for his desertion from a ship, at the instance of the party who had a right to claim his services, placed fairly at the disposal of the master of the ship, and of the Consul of the United States, as the Treaty requires, cannot be re-arrested and held the second time for the same act of desertion, without a violation of his rights under the solemn stipulations made by the United States Government on behalf of their seamen.

At Chambers, before JUSTICE ROBERTSON.

It appears from the return made to the writ of habeas corpus, that Charles Kauffman was arrested on the 1st of November instant, by the Marshal of the Hawaiian Islands, in virtue of a written requisition from the Consul of the United States, representing him to be a deserter from the American whaling bark "Gratitude," whereof William Davis, Jr., is master.

The evidence shows that Kauffman did desert from the "Gratitude," at Honolulu, on the 14th November, 1859; that he was reported, together with several others, as a deserter, by Captain Davis, both at the Marshal's office and the United States Consulate; that he was arrested by the Marshal, pursuant to Captain Davis' request, on the 29th of November, several days after the "Gratitude" had gone to sea, and that he was allowed to ship at the United States Consulate on the

Charles Kauffman.

same or the succeeding day, for service on board of the American whaleship "Sharon." It appears also that Captain Davis did not, before leaving the port, countermand his request to the Marshal for Kauffman's arrest, nor give any instructions, either to the United States Consul or to the Marshal, that if Kauffman was found and arrested he should be detained in custody until he could be reclaimed pursuant to the treaty ; and that the Marshal did, on the 29th of November, when Kauffman came to his office in company with a shipping master, receive from Kauffman the fees and expenses of his own arrest as a deserter, and delivered to him or to the shipping master the certificate usual in such cases, addressed to the Consul of the United States, informing him that Kauffman, being a deserter from the bark "Gratitude," had paid all charges against him at the Marshal's office, and that as the Marshal had no orders to detain him in custody, he was at liberty to ship again, so far as the Hawaiian authorities were concerned.

As I understand the case, it appears to lie in a nutshell; and its decision turns upon the construction to be given to the 10th Article of the Treaty between his Majesty and the United States, and the statute (Civil Code, Sections 621 to 627) made for the purpose of carrying out the treaty stipulations on the part of the Hawaiian Government. The part of the 10th Article of the Treaty, to which I refer, reads as follows :

"The said consuls, vice consuls, and commercial agents are authorized to require the assistance of the local authorities for the search, arrest, detention and imprisonment of the deserters from the ships of war and merchant vessels of their country. For this purpose, they shall apply to the competent tribunals, judges and officers, and in writing shall demand the said deserters, proving, by the exhibition of registers of the vessels, the rolls of the crews, or by other official documents, that such individuals formed part of the crews ; and this reclamation being thus substantiated, the surrender shall not be refused. Such deserters, when arrested, shall be placed at the disposal of the said consuls, vice consuls or commercial agents, and may be confined in the public prisons, at the request and cost of those who shall claim them, in order to be detained until the time when they shall be restored to the vessel to which they

belonged, or sent back to their own country by a vessel of the same nation, or any other vessel whatsoever. The agents, owners or masters of vessels on account of whom the deserters have been apprehended, upon requisition of the local authorities, shall be required to take or send away such deserters from the states and dominions of the contracting parties, or give security for their good conduct as the law may require. But if not sent back nor reclaimed within six months from the day of their arrest, or if all the expenses of such imprisonment are not defrayed by the party causing such arrest and imprisonment, they shall be set at liberty, and shall not be again arrested for the same cause."

According to the provisions of the Treaty and the statute to which I have referred, and which taken together, seem to me to constitute the law governing this subject, there are certain things which must be done by or on behalf of the master, agent or owner, of an American ship, in cases of desertion, if he would avail himself of the rights secured to him by the Treaty. If he would reclaim the deserter, he must make an early report of the desertion, with a request, either personally or through his Consul, that the deserter may be arrested and detained at his expense, and he must reclaim the deserter within six months after his arrest. In all cases, too, where the ship shall have left the port, previous to the arrest of the deserter, the commanding officer shall, on the ship's return, be liable for the expenses of the arrest and detention of the deserter, if the Marshal shall have retained him in custody, for the purpose of his being reclaimed. It is stipulated in the Treaty by the United States, that if a seaman deserting from an American ship shall not be reclaimed for his ship, or sent back to his own country, within six months after his arrest, or if the expenses of his imprisonment are not defrayed by the party causing his arrest and imprisonment, he shall be set at liberty, and shall not be again arrested for the same cause.

Kauffman was arrested as a deserter from the "Gratitude" by the Marshal, on the report and at the instance of Captain Davis, either with or without the formality of a written requisition from the Consul, it makes no difference which, in my opinion, so far as the decision of this case is concerned. When

Kauffman came into the custody of the Marshal, he was at the disposal of the owner, agent or master of the ship, had the latter desired to reclaim him. But the "Gratitude" had gone to sea before Kauffman was found and arrested, and no orders having been left with the Marshal for his detention in custody, he sent him on to the United States Consulate, with the usual deserter's certificate, that the Consul might, if he saw fit, and as has frequently been done in such cases, permit the man to ship and go to sea in some other American vessel; or that the Consul might, as has sometimes been done, require his detention. The Consul, having no instructions from the master or agent of the "Gratitude" to require Kauffman's detention in custody, for the purpose of his being again put on board of that ship, permitted him to deliver himself from the custody of the Marshal, and to engage for service on the "Sharon."

In my opinion, then, it is clear that Kauffman was once arrested and held for his desertion from the "Gratitude," at the instance of the party who had a right to claim his services—placed fairly at the disposal of the master of the ship, and of the Consul of the United States as the treaty requires, and cannot be arrested and held the second time for the same act of desertion, without a violation of his rights under the solemn stipulation made by the United States Government on behalf of their seamen. Six months have elapsed since the day he was arrested, without his having been reclaimed, and his desertion is purged.

Had Kauffman never been arrested at all, the case would have presented a different aspect; but Captain Davis having pursued his remedy up to the man's arrest, and subjected to his reclamation and the Consul's disposal, and having then voluntarily and with the sanction of the Consul too, allowed him to pay the expenses of his own arrest and go free, the treaty provision steps in, like a statute of limitation, and declares the further pursuit of the remedy barred forever.

Something was said during the argument in regard to the local laws, on the subject of seamen, other than that to which I have already referred; but it is obvious that those laws have no bearing on the case. When Kauffman was arrested on the 1st of November instant, he stood in the position, so far as the

Hawaiian laws are concerned, of a seaman lawfully discharged from the ship "Sharon," and could not be legally arrested under Hawaiian laws, for having at some former period deserted from the ship "Gratitude."

In my opinion, therefore, Kauffman is entitled to be discharged from custody.

———

The case having been appealed to the full Court, final judgment was given on the 19th instant, as follows:

ALLEN, C. J.

This writ, which is habeas corpus, was returnable before a single Justice of this Court, and after a hearing on the return of said writ, the petitioner was ordered to be discharged, and from this decision an appeal was taken to the full Court.

The arrest was made by the Marshal of the Kingdom on the 1st of November instant, by virtue of a requisition of the Consul of the United States, representing him to be a deserter from the American whaling bark "Gratitude," whereof William Davis, Jr., is master.

It appears in evidence that the petitioner was a deserter from the "Gratitude" in November, 1859, at this port, and that he was soon after arrested by the Marshal at the request of the master of said vessel. In the meantime the "Gratitude" had sailed, and leaving no means to pay the prison expenses, the Marshal reported him to the Consul as a deserter from that vessel, that the fees had been paid to that time, and having no orders to detain him further, he was at liberty to ship, so far as the Hawaiian authorities were concerned.

It is clear by the treaty that the Consul has authority to call on the local authorities to arrest and imprison deserters, and when arrested are at his disposal, and may be confined in the public prisons at the request and cost of those who shall claim them, in order that they may be restored to their own vessel, or sent home. What is the authority of the Consul within this provision? It is full authority to cause the arrest and imprisonment, for the purpose of returning the deserters to their own vessels, or sending them home on some other. But we do not

see that he has any authority to confine them in prison at the cost of those claiming them, unless it is by especial request. The treaty further provides that if they are not sent back, or reclaimed within six months from the day of their arrest and imprisonment, they shall be set at liberty, and shall not again be arrested for the same cause.

When the Consul demands an arrest, he is required to show the register of the vessel, the rolls of the crew, or other official documents, that such individuals formed part of the crew. In the present case, it does not appear that the Consul issued such order, but it is in proof that the master of the vessel made the request, and in pursuance thereof the arrest was made, and the petitioner held in custody, and this was authorized by the local law. So that it appears that the party causing such arrest and imprisonment was the master of the vessel; but as he furnished no means to pay the expenses of the detention, the Marshal informs the Consul that he is a deserter from the bark " Gratitude," and having paid his fees, and having no orders to detain him, from any authority, he was at liberty to ship him. The Consul was authorized to cause the deserter to be remanded to prison at the cost of the master, if he had requested him so to do, in order that he might be restored to his own vessel, or sent home. But he did not deem it proper to take this course, but certified to his shipment on the American bark " Sharon."

The master cannot complain, as the request for the arrest and imprisonment was made by him on the Marshal, and he left the Kingdom without furnishing any means to pay the expenses of the detention. The Consul was informed that he was a deserter, and arrested at the master's request, but that he had not left means to pay the cost of the detention, and, with a knowledge of these facts, he deemed it his duty to permit him to enter the service of another American ship, from which he has recently been discharged. Every facility was afforded the master to carry into effect the stipulations of the treaty, and gain its advantages, but failing to meet the expenses, the Marshal had no right, or at least was under no obligation to hold the deserter, so far as the master's request was concerned. But it is contended that the Consul should have given the order to the Marshal for the arrest, and the arrest not having been made in pur-

suance of such order, it was inoperative, so far as giving any rights to the petitioner under treaty. It appears that the arrest was made at the request of the master of the vessel directly to the Marshal, and not by the Consul at the master's request. It hardly seems tenable that the master should repudiate his own doings, especially as he has subjected the petitioner to the same arrest and detention as he would have suffered had the request been made through the Consul. It is substantially the same restraint upon his liberty, and accomplished by the request of him who had a right to make it. The master neglected to carry out the purposes of the arrest by not furnishing the necessary means of support, and when the Consul was made cognizant of what had transpired, he does not remand the petitioner, but certifies to another contract of shipment on the bark "Sharon."

It is contended that the Consul has not authority to discharge a deserter. That is true, unless the desertion is made for cause. In this case the Consul has not discharged the deserter, but by operation of the express provision of the Treaty he is released from a second arrest by the acts of the master himself. He had caused his arrest and failed to comply with the stipulations of the Treaty, and a discharge necessarily followed. The Consul had the authority to remand the petitioner and comply with the conditions of the Treaty, but he not only does not do this, and he certainly was under no obligation to do it, but certifies to another contract of shipment. The Treaty should be carried out in its true spirit and intent, and no deserter should be arrested a second time for the same cause. If the petitioner can again be arrested, and placed on board the ship from which he had deserted, the subsequent contract on the "Sharon," certified by the Consul, was clearly illegal, and void as against the rights of the owners of the ship on which he first engaged, and it would present the seaman with the obligations of two contracts, in terms legal, and yet the last in date inoperative and void, although made with the approval of the Consul, with full knowledge. He has passed the ordeal of arrest and imprisonment, at his own expense, as the evidence shows, although he was arrested at the request of the master, and the Consul did not order the imprisonment to be continued, but certified to a

contract on another vessel in the American service, and yet he is still sought to be again arrested, and imprisoned for the same cause. But it is said that the Consuls or Commercial Agents of the United States have no power to dissolve a contract in any case. We do not perceive the relevancy of this proposition to this case, still we will remark that we had supposed that by the laws of the United States, and the decisions in their Courts of Admiralty, that those officers could authorize the discharge of a seaman for an obstinate disobedience of orders, or on account of sickness creating disability to discharge his duty, especially if caused by his own fault, or in cases where the master has violated the stipulations of the shipping articles, also if the vessel is unseaworthy, or the seaman subjected to cruel treatment. We do not mean that Consuls have judicial powers to punish, but if a seaman is taken from a vessel in a foreign port and sent home for a crime, his contract with the vessel is at an end, and he cannot recover any wages subsequently accruing ; so if the seaman is sent home by the Consul. (Act of 1840, chap. 48, sec. 9, 14, 17 ; Statutes at large, 395 ; Tingle vs. Tucker, Abbot's Admiralty, 519 ; 4 Ware, 65 ; 1 Peter's Admiralty, 168, 186 ; 2 Peter's Admiralty, 268 ; 4 Mason's Rep., 541 ; Smith vs. Treat, Davis, 268.)

Although the contract is terminated, it does not follow that the deserter is not answerable in damages for the consequences. It is the personal liberty of the petitioner which is now in question.

It is contended by the counsel for the master, that the American Treaty was not designed to protect American seamen. If this is sound doctrine, of which the Court very much doubt, it certainly was not intended to oppress them. The history of judicial proceedings very fully illustrates the favor with which they have been regarded by the Courts of Common Law, and still more by the Admiralty. Mr. Justice Story very truly remarks, in the case of Harder vs. Gordon, 2 Mason's Rep., 551, "that every Court should watch with jealousy any encroachment upon the rights of seamen," and that "Courts of maritime law have been in the constant habit of extending towards them a peculiar protecting favor and guardianship ;" and there is no nation which has guarded them more carefully by the pro-

Charles Kauffman.

visions of its own laws than the United States. The Court regard this article as designed to suppress desertion, and in all cases to place it within the power of the master of a vessel to reclaim a seamen if he conforms to its requirements. We regard the treaty as giving rights to masters and seamen. The seaman has his rights under this instrument, and no Courts will guard them with more care than the Admiralty Court of the country under whose flag this vessel sails.

It is further contended that the Marshal is not obliged to discharge at the end of six months, unless there was a Hawaiian statute compelling it. The treaty expressly declares that if the deserter is not sent back, nor reclaimed within six months from the day of the arrest, or if all expenses of imprisonment are not defrayed by the party causing such arrest and imprisonment, he shall be set at liberty. This is a right given to the seaman. The American Government will hardly justify this Government for detaining in prison their seamen when those whose duty it was to support them had failed to do so. They must then be set at liberty. It is a right which enures to the seaman, and every person to whom the treaty refers can call on the Courts to give it force. If there was a doubt in the construction of the treaty, and what is required by its terms, the man whose liberty would be forfeited by it, should have the benefit of it. But in this case we are clear in our views, that having been once arrested as a deserter and discharged because the stipulations of the treaty were not complied with, and again shipped by the Consul of the United States, with a full knowledge of all the facts of the desertion, arrest and imprisonment, he cannot be again arrested for the same cause. Therefore, let the petitioner be discharged.

Mr. Harris, for the petitioner.

Mr. Bates, for the master.